### In re JOHN RICHARDS HOMES BUILDING CO., L.L.C., Debtor.

No. 02–54689.

United States Bankruptcy Court, E.D. Michigan, Southern Division.

April 25, 2003.

728

Norman L. Lippitt, Kenneth F. Neuman, Birmingham, MI, for petitioner.

Norman C. Ankers, Detroit, MI, Ruth E. Zimmerman, Lansing, MI, for alleged debtor.

## Opinion Regarding Alleged Debtor's Damages

STEVEN W. RHODES, Chief Judge.

Following the dismissal of this involuntary petition, the Court conducted an evidentiary hearing on a request for compensatory and punitive damages by the alleged debtor, John Richards Homes Building Company, L.L.C. ("JRH"). The Court concludes that the petitioning creditor, Kevin Adell, filed this involuntary petition in bad faith and that JRH is entitled to compensatory damages in the amount of $4,100,000 and punitive damages in the amount of $2,000,000. The Court further concludes that JRH is entitled to an award of attorney fees and costs in the amount of $313,230.68.

### I.

JRH's request for damages and attorney fees is based on 11 U.S.C. § 303(i), which provides:

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

11 U.S.C. § 303(i).

Thus, the Court is authorized to award JRH its reasonable attorney fees and costs. In addition, the Court may award compensatory and punitive damages if it finds that Adell filed the involuntary bankruptcy petition in bad faith. "[T]here

is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." *United States Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc.,* 58 B.R. 1008, 1011 (N.D.N.Y.1986). In *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.,* 265 B.R. 574 (Bankr. N.D.Ohio 2001), the court discussed the bad faith determination under § 303(i) and stated:

> The Sixth Circuit has not addressed this issue. On issues of good faith and bad faith, however, the Sixth Circuit generally looks to the totality of the circumstances. *See Hardin v. Caldwell (In re Caldwell),* 851 F.2d 852, 860 (6th Cir.1988); *see also Industrial Ins. Servs., Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1127 (6th Cir.1991); *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030, 1033 (6th Cir.1988). This Court, therefore, adopts that as the appropriate test.

*Id.* at 582.

■ This Court agrees that in assessing whether Adell filed this involuntary petition in bad faith, it is appropriate to examine the totality of circumstances.

## II.

JRH asserts that Adell filed the petition in a bad faith campaign to extort an unreasonable settlement of the parties' dispute and to destroy JRH's business due to Adell's personal antipathy toward John Shekerjian, JRH's principal.

Adell asserts that he filed the petition in good faith. Specifically, he states that he relied on the advice of experienced bankruptcy counsel who, before determining that an involuntary bankruptcy petition would be proper, investigated JRH's financial circumstances and the circumstances of JRH's debt to Adell. He also asserts that in filing the petition, he was motivated by a concern for JRH's trade creditors.

JRH is in the business of constructing new homes priced at over $1 million. Adell's claim against JRH arises from a contract for the sale of property and the construction of a new home. (Ex. 17.) The parties signed this contract on December 28, 2001. Pursuant to the contract, JRH agreed to sell to Adell a 1.8 acre parcel of property in Bloomfield Hills, Michigan, and to construct a home for Adell on the property. Adell agreed to pay a total of $3,030,000. The contract required JRH to commence construction "within a reasonable time after this Agreement is signed and plans are completed and permit is issued." (Ex. 17, para.8.)

The sale closed on February 28, 2002. The closing papers, signed by Adell, reflect that Adell agreed to allocate $1,750,000 for the purchase of the property and the balance to the building construction. (Exs. 1 and 2.) The deed also reflects this purchase price. (Ex. 3.) First Federal of Michigan financed the purchase for Adell.

In the next several months, two primary disputes developed. First, Adell asserted that the true value of the real property was $1 million rather than the $1.75 million stated in the closing papers and in the deed. Thus, he contended that the excess of $750,000 was actually an improper initial construction draw to which JRH was not entitled. Second, Adell asserted that the delays in commencing construction were unreasonable.

On June 6, 2002, Adell filed suit in the Oakland County Circuit Court against JRH, Shekerjian, First Federal and others, alleging fraud and misrepresentation, silent fraud, innocent fraud, breach of contract, Consumer Protection Act violations, unjust enrichment, accounting and constructive trust. (Ex. 5.)

On June 18, 2002, JRH filed: (1) an answer denying the substance of Adell's claims; (2) affirmative defenses; and (3) a verified counter-complaint alleging breach of contract, business defamation, business libel, injurious falsehood, tortious interference with business relations and extortion. (Exs. 5 and 6.) JRH also filed an emergency motion for a temporary restraining order and a preliminary injunction.

Six days later, on June 24, 2002, Adell filed this involuntary petition against JRH. This petition alleged that Adell's claim was $800,000 for fraud and breach of contract, and that he was eligible to file the petition under 11 U.S.C. § 303(b), i.e., that his claim was not subject to a bona fide dispute.

On July 1, 2002, JRH filed a motion to dismiss. JRH asserted that Adell's claim was the subject of a bona fide dispute, as it was still in the very early stages of contested litigation. JRH also asserted that the petition was filed in bad faith and that therefore, JRH was entitled to substantial compensatory and punitive damages. JRH also requested attorney fees and costs.

On July 15, 2002, after a hearing, the Court dismissed the petition, finding that Adell "knew or surely must have known that his claim was the subject of a bona fide dispute, and therefore that he was not qualified to be a petitioning creditor." (Tr. of July 15, 2002, hr'g at 27–30.) The Court retained jurisdiction to resolve JRH's requests for compensatory and punitive damages and for attorney fees.

### III.

After examining the totality of circumstances, the Court finds that JRH has established by a preponderance of the evidence that Adell filed the involuntary bankruptcy petition in bad faith. Indeed, the Court finds that the evidence overwhelmingly supports this conclusion:

1. As the Court found on July 15, 2002, when Adell filed this involuntary bankruptcy petition, he knew or should have known that his claims were the subject of a bona fide dispute. By then, JRH had responded to Adell's state court complaint by filing substantial defenses, affirmative defenses and counterclaims.

Adell testified that he was not aware of these responsive pleadings until after the involuntary bankruptcy petition was filed. There are four problems with this position:

First, his state court attorneys were aware of these pleadings before the petition was filed. His attorneys' failure to advise him of them in a timely way can be of no help to him.

Second, the nature of Adell's claims was such that he would certainly not require legal advice to understand that he and JRH would have real and substantial legal and factual disputes, and further that the litigation to resolve these disputes would be lengthy and costly. Even before JRH filed responsive pleadings, Adell could not have reasonably concluded that JRH would simply admit that it had committed the frauds and the other intentional wrongs that he had alleged.

Third, the evidence establishes that even if Adell was not aware of JRH's responsive pleadings, he already knew that his state court claims would be contested. At least twice before Adell filed the involuntary petition, JRH's attorneys specifically told Adell's attorneys that JRH would contest Adell's claims and that therefore an involuntary petition would be improper. First, after Adell threatened to file an involuntary bankruptcy petition during a meeting on June 3, 2002, attorney E. Michael Morris, representing JRH, sent a letter dated June 5, 2002, to attorney Dennis Dlugokin-

ski, representing Adell. (Ex. 10.) In that letter, Morris advised Dlugokinski that an involuntary petition would be improper and threatened "severe sanctions for damages in the event [Adell] files a frivolous petition for bankruptcy." Then, on or about June 18, 2003, attorney Steven Howell, representing JRH, spoke directly to attorney Bob Carson, representing Adell, and stated that JRH disputed Adell's claims and that the parties' dispute was "extremely contentious." (Tr. of Dec. 18, 2002, hr'g at 55–6.)

Fourth, Adell took no action to withdraw the involuntary petition when he did become aware of JRH's state court responses.

2. Adell knew of the serious harm that JRH would suffer as a direct consequence of the involuntary filing. Indeed the evidence establishes that Adell intended to cause that harm. At a meeting on June 3, 2002, Adell specifically asked Shekerjian, "Can the company take the hit to its reputation if an involuntary bankruptcy was [sic] filed?" (*Id.* at 37–8.) Adell denied this (Tr. of Jan. 14, 2003, hr'g at 77), but the Court finds that his denial lacks credibility.

Further evidence of Adell's intent to harm JRH is Adell's extraordinary effort and expense to hire a public relations firm, Marx Layne, to publicize the bankruptcy filing. (Tr. of Dec. 18, 2002, hr'g at 109.) For that purpose, Marx Layne contacted three newspapers, the Detroit News, the Detroit Free Press and Crain's Detroit Business. On June 25, 2002, the day after the involuntary petition was filed, a Marx Layne representative sent separate email messages to reporters for the Detroit News and the Detroit Free Press, apparently following up on conversations concerning the filing. (Exs. 18 and 19.) Each message vaguely referred to "payoffs" by JRH to its creditors, apparently to keep

them from joining in the petition, but noted, "The payoffs won't do any good, because as of yesterday, Adell's new lawyer, ArnieSchaefer [sic] (248)–5540–3340[sic] filed Ch. 7 in U.S. Bankruptcy Court against John Richards Homes."

Each message also attached a list of nine JRH customers whose contracts JRH had allegedly not fulfilled and outrageously stated that a state court hearing then scheduled for the following Wednesday "is sure to be worthy of coverage with plots and subplots and high profile business people coming to the surface." In an attempt to maximize the probability of news coverage, each message falsely stated that the recipient was the only reporter in the area with this information. Finally, each message stated, "We would appreciate you keeping our name out of any conversations regarding this high-profile story."

On July 1, 2002, Marx Layne faxed a copy of the petition to a reporter with Crain's Detroit Business, along with the same list of nine JRH customers. (Ex. 15.) Crain's publicized the involuntary filing. (Tr. of Dec. 18, 2002, hr'g at 105.)

At the hearing, Michael Layne, a partner at Marx Layne, testified that Adell told him directly what he wished to be done in connection with the engagement, that Adell provided the information about the "payoffs," that Adell's secretary, Tricia St. Andre, provided the list of JRH customers, and that the messages were for the purpose of obtaining newspaper reporting of the involuntary proceedings. (*Id.* at 112–13.) On cross examination, Layne also testified that Adell did not hire the firm simply to handle media inquiries. (*Id.* at 120.) Layne further testified that Adell stated that he was concerned about JRH's trade creditors. (*Id.* at 119.)

It is also noteworthy that at the hearing, two of JRH's customers on the list of nine

customers stated to be dissatisfied with JRH, Jean McIntyre and Larry Gainer, testified that they were in fact satisfied with JRH's work. (Tr. of Jan. 14, 2003, hr'g at 144–49.)

3. On May, 31, 2002, attorney Dlugokinski, representing Adell, sent a letter to Shekerjian outrageously threatening *criminal prosecution* by "the Michigan Attorney General's Office, the Oakland County Prosecutor's Office and/or the Federal Bureau of Investigation and other federal and state agencies and departments having jurisdiction[,]" unless Shekerjian agreed to remove any mortgages and liens on the property, to cancel any debt owing by Adell, and to make restitution and pay damages. (Ex. 9.) Dlugokinski made a similar threat during the parties' meeting on June 3, 2002. (Tr. of Dec. 18, 2002, hr'g at 41.)

4. Adell's involuntary bankruptcy petition alleged that JRH owed him $800,000 for fraud and breach of contract. (Ex. 4.) However, Adell was unable to articulate how that amount was calculated.

5. Adell used improper threats and flaunted his wealth in an attempt to solicit creditors to join his petition. Two such creditors testified. Cynthia Weaver, credit manager of E.W. Kitchens, testified that Adell called her and stated that he was a very rich man, that he was angry and that he was trying to force JRH into bankruptcy. He then stated that he was looking for creditors to sign with him for the bankruptcy and that if she wanted to be paid, that would be the only way. He told her that he owned Novi Expo Center, a TV network and a couple of TV stations, and that it would not cost her anything to join in the bankruptcy petition. Adell then encouraged her to call his attorneys. She called attorney Michelle Didorosi at Carson Fischer, who verified Adell's statements.

Robert Clark of Motor City Stone, an excavating company testified that Adell called him twice to get him to sign on the bankruptcy petition. In the first call, Adell told him that only people who signed on would be paid. The second call, Adell threatened that he would see that people who did not sign on would not be paid.

Again, Adell denied these statements. (Tr. of Jan. 14, 2003, hr'g at 9–10, 14.) However, the Court concludes that Adell's denials lack credibility.

Adell told Shekejian directly that he was worth $700 million and that he wanted his brother in law to finish the house. (Tr. of Dec. 18, 2002, hr'g at 222–24.) After their dispute surfaced, Adell also told Shekerjian that when the City of Franklin Hills had given him a hard time about certain permits required for a home that he wanted to build there, this made him mad, so he built "the ugliest home he could possibly think of just to piss them off." (Tr. of Dec. 18, 2002, hr'g at 229.) Shakerjian took this to mean that Adell was willing and able to spend significant money just to get back at someone who made him mad and he found it "scary." (*Id.*)

6. Adell's testimony that he filed the petition in reliance on the advice of experienced bankruptcy attorneys and therefore in good faith must be rejected. The record certainly establishes that Adell's counsel did some substantial investigation before concluding that an involuntary petition would be proper. Attorney Max Newman of Schafer and Weiner, the law firm that filed the petition for Adell, testified that in the ten days before the petition was filed, he twice discussed with Adell the nature and circumstances of his claims against JRH. Newman testified:

> First and most importantly, we met with our client regarding the elements of an involuntary bankruptcy petition. We

spoke with him about whether there was a disputed claim as well as about the status of the entity John Richards Homes Builders, L.L.C., itself. We—I had two meetings prior to the involuntary at least with Mr. Adell where we went into the issue of whether or not the claim was disputed, and I believe specifically the question I asked him was, is there a portion of the claim over $12,000 that John Richards Homes Builders would admit. Mr. Adell and Mr. Lametti advised me that there was a portion of the claim that would be admitted.

(*Id.* at 95.)

Newman further testified that he also confirmed with Dlugokinski, who had filed Adell's state court suit against JRH, that JRH would admit a claim over $12,000. (*Id.* at 96-7.) When Newman was asked about the $800,000 claim amount stated in the involuntary petition, he testified, "The portion that was always discussed as undisputed was a lower amount, in the $130,000 range, which related to construction draws made where no construction was performed." (*Id.* at 100.)

Finally, Newman recounted a meeting with Adell and attorney Lametti just before the petition was filed. He stated,

And I specifically again went over the disputed—potentially disputed claim issue, and I think it was specifically at that point I asked both of them to assure me again that there was a dollar amount that John Richards Homes Builders, L.L.C., would admit that exceeded $12,000. I believe that I advised them words to the effect that it would be a big problem if there was not.

(*Id.* at 100–01.)

Newman's testimony is significant in three distinct respects. First, Newman specifically advised Adell of the critical importance of establishing an undisputed claim over $12,000. Second, Newman advised Adell that if JRH did dispute his claim, "there would be a big problem." (*Id.*) Third, when Newman determined that JRH would admit a claim in the range of $130,000, he relied solely on assurances from Adell and Adell's attorneys.

The difficulty here is that those assurances were false and Adell and his attorneys knew it. They withheld from Newman significant information that plainly would have, or should have, made a difference on the critical issue of whether JRH either "admitted," or at least did not dispute, any portion of Adell's claim. Specifically, Newman testified to three items that neither Adell nor his attorneys provided. The first was Morris's letter of June 5, 2002, to Dlugokinski (Ex. 11), in which Morris clearly took the position that Adell had explicitly agreed to the purchase price of $1,750,000 for the real property and that it was Adell, not JRH, that was in breach of the construction contract. (Tr. of Jan. 14, 2003, hr'g at 103.) The second was another letter that Morris sent to Dlugokinski on June 5, 2002, (Ex. 10) in which Morris demanded that Adell cease disparaging JRH and cease soliciting creditors for an involuntary bankruptcy petition. Morris also threatened "severe sanctions for damages in the event it files a frivolous petition for bankruptcy." (Tr. of Jan. 14, 2003, hr'g at 104.) Third, and most inexplicably of all, Adell and his state court attorneys never gave Newman's firm a copy of JRH's answer to Adell's state court complaint or JRH's counterclaim. (*Id.* at 105.)

It is fundamental that a client reasonably relies on an attorney's advice only when the client provides to the attorney all of the pertinent facts in the client's possession. *See United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1404 (4th Cir.1993) (One who willfully avoids the duty to disclose all material

facts cannot rely in good faith on the advice of counsel.); *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1436 (10th Cir.1988) (Full disclosure to professional must be established to support a defense of reliance.); *United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir.1984) ("In order to take advantage of [the defense of good faith reliance on the advice of counsel], the defendant must show that he relied in good faith after first making a full disclosure of all facts that are relevant to the advice for which he consulted the attorney.").

Here, Adell did not make a full disclosure, and apparently deliberately so. Newman's advice that an involuntary petition would be proper was based on Adell's assurance that JRH would admit a claim of at least $12,000. However, as found above, Adell knew that JRH would vigorously dispute his claim and therefore that this assurance was false. Moreover, Newman certainly would have determined that the assurance was false if only Adell had not withheld pertinent facts and documents. Accordingly, Adell's defense of reliance on counsel must be rejected.

Indeed, Adell's conduct in deliberately withholding evidence from his bankruptcy counsel is further evidence of his bad faith in causing the involuntary petition to be filed.

7. Adell falsely testified that in filing the involuntary petition, he was motivated by a concern for JRH's trade creditors. If he were indeed so charitably motivated, he would not have threatened at least two creditors that the only way they would be paid would be to join in the petition.

The totality of the circumstances compels the conclusion that Adell did not honestly believe that the involuntary bankruptcy petition would be appropriate. Adell did not file this petition in a sincere and honest belief that he was entitled to bankruptcy relief against JRH. Rather, he proceeded with the wrongful intent to intimidate Shekerjian into a settlement and, when that failed, to damage or destroy his business. This involuntary bankruptcy petition was not filed in good faith.

## IV.

■ The Court concludes that because Adell did not file this petition in good faith, JRH should be awarded compensatory damages. 11 U.S.C. § 303(i)(2)(A) Such an award should be fashioned to compensate JRH for its damages, calculable with a reasonable degree of certainty, proximately caused by the improper filing. *See Glannon v. Carpenter (In re Glannon)*, 245 B.R. 882, 896 (D.Kan.2000); *In re Landmark Distr., Inc.*, 189 B.R. 290, 315–16 (Bankr.D.N.J.1995); *Sjostedt v. Salmon (In re Salmon)*, 128 B.R. 313, 316 (Bankr. M.D.Fla.1991).

■ JRH seeks an award of compensatory damages for lost profits.

Shekerjian credibly testified that the ability of JRH to compete in the market for high end homes is critically affected by its reputation. (Tr. of Dec. 18, 2002, hr'g at 200–01.) He further stated that in the five years preceding the filing his entities had built and sold 40 homes costing over $1 million each. (*Id.* at 194.) However, since the involuntary was filed, JRH has not contracted with a single customer because of the damage to JRH's reputation that the filing caused. (*Id.* at 195–96.) He also stated that two pending sales were lost as a result of the filing. In his experience, the market for homes in this price range is not impacted by the downturn in the economy or by the tragic events of September 11, 2001. (*Id.*) Since then, other builders have obtained significant numbers of permits to build homes in this geographic and price market. (*Id.* at 209.)

JRH presented the testimony of Thomas Frazee on the issue of damages. Frazee is a certified public accountant specializing in litigation support. He concluded that JRH had incurred damages for lost profits of $4.1 million as a result of the bankruptcy filing, conservatively calculated. (*Id.* at 139.) This calculation assumes that the filing will have impact on JRH's business for five years; that JRH's future profit margins would be consistent with its historical profit margin of 17%; that JRH will achieve future homes sales prices consistent with the historical average of $1.9 million (calculated after a couple of very high priced homes were removed); that during the next five years, JRH would lose half of its historical average of eight homes per year; and that JRH lost two of its pending sales due to the bankruptcy filing. (*Id.* at 139–48.) He also stated that the calculation was discounted to determine the present value of future lost profits. (*Id.* at 134.)

Regarding compensatory damages, Shekerjian testified that it was reasonable for Frazee to base his calculations on a historical average sales price of $1.9 million and a historical average profit margin of 17%. (*Id.* at 202–03.) He stated however that Frazee's assumption that JRH's reputation would be restored in five years was unreasonable, since in his judgment it will take much longer. Thus, this assumption resulted in a conservative calculation of JRH's lost profits. He also concluded that Frazee's assumption that JRH will be able to contract for half of its historical 7—8 homes per year on average is also conservative in light of JRH's inability to contract with any customers since the bankruptcy filing. (*Id.* at 204–05.) Therefore, he concluded that Frazee's estimate of lost profits damages of $4.1 million is conservative.

The Court finds that Frazee's calculation of lost profits and the assumptions on which that calculation is based are entirely reasonable. Frazee testified with credibility. His expertise and methodology were not undermined in any substantial way. His assumptions were supported by other credible evidence. His calculation of JRH's damages is to a reasonable degree of certainty in the circumstances. Any lingering uncertainty about the calculation of lost profits is a result of Adell's own conduct in filing the improper bankruptcy petition and thus must not be permitted to prejudice JRH. The Court finds that JRH is entitled to an award of compensatory damages in the amount of $4,100,000.00.

## V.

### A.

In determining whether to grant an award of punitive damages for a bad faith involuntary bankruptcy petition, the court in *In re K.P. Enter.*, 135 B.R. 174 (Bankr. D.Me.1992), stated:

The purposes for assessing punitive damages are to punish the wrongdoer, to deter him from repeating his misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct. Under § 303(i), the inquiry invokes a federal standard, requiring the court to exercise its discretion in a manner that will discourage misuse of the bankruptcy process, without discouraging resort to it in appropriate circumstances. If punitive damages are called for, the award must be carefully tailored in light of other damages and fees awarded in the case, so that the result implements bankruptcy policy, but is not "unduly harsh."

*Id.* at 183–84 (citations omitted).

Likewise, in *In re Silverman*, 230 B.R. 46 (Bankr.D.N.J.1998), the court explained:

Examination of the many cases addressing imposition of punitive damages under section 303(i)(2) reveals that the factors which support a finding of bad faith also justify imposition of punitive damages. Although punitive damages are not automatically imposed upon a finding of bad faith, a punitive damages award is predicated upon a finding of bad faith. Consequently, once the court has found bad faith, the court must decide whether punitive damages are appropriate and, if so, in what amount.... [T]he totality of the circumstances must be considered in fashioning an appropriate award under section 303(i)(2). Therefore, although this court found that bad faith is established per se by filing an involuntary petition after denial of summary judgment in another forum, all mitigating or aggravating factors are nonetheless relevant in assessing punitive damages.

In imposing punitive damages on a petitioning creditor, the dual purposes of punishment and deterrence must be effectuated. Unlike compensatory damages, punitive damages are neither measured by actual loss nor are they measured strictly in light of the impact of the creditor's bad faith on the alleged debtor. *See In re Grecian Heights Owners' Association,* 27 B.R. at 174 (Bankr.D.Or.1982) (punitive damages operate as a deterrent rather than as compensation for actual loss).

*Id.* at 52.

■ "The general rule is that the amount of punitive damages must bear some reasonable relation to the injury inflicted and its cause." *In re Atlas Mach. & Iron Works, Inc.,* 190 B.R. 796, 805 (Bankr.E.D.Va.1995). Traditionally, courts evaluate such factors as the nature and extent of the injury to the alleged debtor, the intent of the bad faith petition-

ers, and surrounding circumstances. *See In re Mundo Custom Homes, Inc.,* 179 B.R. 566, 571 (Bankr.N.D.Ill.1995). *See also Atlas Mach. & Iron Works,* 190 B.R. at 805–06 (awarding $25,000 in punitive damages where faced with a "blatant attempt" to circumvent the requirements of the Bankruptcy Code); *In re Salmon,* 128 B.R. at 318–19 (awarding $250,000 in punitive damages where petitioners acted willfully and maliciously); *In re Camelot, Inc.,* 25 B.R. 861, 869 (Bankr.E.D.Tenn.1982) (assessing $1,000 in punitive damages where petitioners "vindictively" filed their petition).

### B.

This Court must also consider the pronouncements of the Supreme Court concerning the reasonableness of punitive damage awards in the context of constitutional due process and fair notice considerations. In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court stated, "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Id.* at 568, 116 S.Ct. at 1595. The Supreme Court further stated, "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" *Id.* at 575, 116 S.Ct. at 1599 (footnote and citations omitted).

Addressing a second factor to be considered, the Court stated, "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580, 116 S.Ct. at 1601. The Court noted that it

had consistently rejected any mathematical bright line test. *Id.* at 582, 116 S.Ct. at 1602. However, the Court noted that in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), it approved punitive damages of more than 4 times compensatory damages. It further noted that in *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), it approved punitive damages that were up to 10 times the potential damages. In *Gore,* the Supreme Court disapproved of punitive damages that were 500 times the actual damages to the plaintiff. 517 U.S. at 582, 116 S.Ct. at 1602.

Finally, the Court in *Gore* stated, "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." 517 U.S. at 583, 116 S.Ct. at 1603.

Most recently, in *State Farm Mut. Automobile Ins. Co. v. Campbell,* — U.S. ——, 123 S.Ct. 1513, — L.Ed.2d —— (2003), the Supreme Court reiterated its holding in *Gore.* The Supreme Court

> instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* at 1520–21.

On the first consideration, the Court in *Campbell* stated, "We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target

of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 1521–22. The Court further explained:

> "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."

*Id.*

Addressing the second factor, the Court in *Campbell* followed the path established in *Gore.* "We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 1523–24. The Court did observe, however, "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* "In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 1524–25.

Finally, addressing the third factor, the Court in *Campbell* cautioned, "The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award,

however, the criminal penalty has less utility." *Id.* at 1525.

After reviewing these factors in the circumstances presented, the Supreme Court in *Campbell* disapproved of punitive damages that were 145 times the compensatory damages.

## C.

■ The Court will now address the considerations appropriate in fixing punitive damages in this case. Regarding the first factor mandated by the Supreme Court, it has already been determined that the evidence of Adell's bad faith is overwhelming. He was told and knew that JRH contested his claims. He withheld crucial information from his bankruptcy attorneys. He engaged in campaign of publicity and disparagement with the specific intent to injure JRH. He threatened JRH with criminal prosecution. He flaunted his wealth. He cynically asserted a false concern for creditors. He presented no credible mitigating considerations. By any objective measure, this involuntary bankruptcy petition is an extreme case of abuse of the bankruptcy process. Adell's conduct was reprehensible and must be deterred and punished.

Regarding the second factor, it has already been determined that JRH is entitled to compensatory damages of $4,100,000. Thus, within the permissible ratio that the Supreme Court has suggested, punitive damages might be assessed up to about $41,000,000, depending on the other considerations. *Gore,* 517 U.S. at 582, 116 S.Ct. 1589; *Campbell,* 123 S.Ct. at 1523–24.

Regarding the third factor, the Court observes that the most analogous federal crimes are false oath in a bankruptcy case under 18 U.S.C. § 152 and perjury under 18 U.S.C. § 1621. Conviction on these felonies can result in a fine of twice the victim's loss. 18 U.S.C. § 3571(d). *See United States v. Garrison,* 133 F.3d 831, 849 (11th Cir.1998); *United States v. Tocco,* 135 F.3d 116, 132 (2d Cir.1998); *United States v. Wilder,* 15 F.3d 1292, 1300–01 (5th Cir.1994). In determining punitive damages in a civil matter, it is appropriate to consider the federal criminal fine statute, 18 U.S.C. § 3571. *Baker v. Hazelwood (In re Exxon Valdez),* 270 F.3d 1215, 1245 (9th Cir.2001). Nevertheless this Court is mindful of the Supreme Court's caution in *Campbell* that this consideration has "less utility." *Campbell,* 123 S.Ct. at 1526.

The Court concludes that punitive damages of $2,000,000 are necessary and appropriate in this case. Such a punishment is approximately one-half of the compensatory damages of $4,100,00. It is approximately one twentieth of the maximum limit that Supreme Court suggests for due process purposes, here $41,000,000. It is approximately one fourth of the maximum fine for the most analogous federal crime, here $8,200,000. In the Court's judgment, this is the minimum punitive damage amount that will address the dual purposes of adequate deterrence and punishment.

■ One final note regarding punitive damages is necessary. During discovery, in a notice of deposition served on July 17, 2002, JRH sought information about Adell's net worth on the theory that this information would be relevant to the determination of punitive damages. However, in a motion for a protective order filed on July 31, 2002, Adell asserted that his "finances are not relevant to any issues in this dispute[,]" and that JRH's "demand for documents relating to [his] finances is an invasion into his privacy and serves no purpose other that to harass [him]." (Adell's motion for a protective order, July 13, 2002, para. 5.) Adell further asserted

that his "finances have no relevance to the measure of punitive damages even if this Court does determine that punitive damages are appropriate." (*Id.* at para. 7.) In support, Adell cited the Supreme Court's decision in *Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. After a hearing on September 9, 2002, the Court agreed with Adell that if he chose not to make an issue of his ability to pay, then his objection to discovery on this issue should be sustained on relevance grounds. Accordingly, in now determining punitive damages, the Court has acceded to Adell's request not to consider his ability to pay.

### V.

■ Pursuant to 11 U.S.C. § 303(i)(1), counsel for JRH also seeks an award of attorneys fees of $294,941.50, plus costs of $27,851.68. In support of this request, counsel submitted a detailed fee statement.

The Court concludes that an award of reasonable fees and costs is entirely appropriate in the circumstances of this case, to make JRH whole.

Adell contends that the fee request is so outrageous that the entire request should be rejected. In the alternative, Adell argues that fees for services rendered before the petition was filed are not compensable; that the services are insufficiently detailed; that fees for duplicative services are improper; and that the hourly rates are too high.

The Court has reviewed the fee statement in detail and concludes that Adell's objections should be overruled, with one exception. The Court does not consider that this fee application is outrageous. Rather, it reflects a commitment to zealously and competently represent a client with a critical legal problem and to do so with extraordinary speed and diligence in order to maximize the chances of successfully defending against the petition and,

ultimately, saving the business. The Court is satisfied that JRH's attorneys worked no harder or longer than necessary to defend its client's business from Adell's attack. Moreover, the Court is satisfied that there is sufficient detail in the application to determine a reasonable fee, that there was no unnecessary duplication of services, and that the hourly rates are reasonable.

■ The one objection that must be sustained is Adell's objection to the request for fees for pre-petition services. The Court agrees that awarding fees for such services is not proper under § 303(i)(1). *See In re Kearney,* 121 B.R. 642, 645 (Bankr.M.D.Fla.1990). Accordingly, $9,562.50 will be deducted from counsel's fee award.

The Court awards fees and costs in favor of JRH in the amount of $313,230.68.

An appropriate order will be entered.