RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re  JOHN RICHARDS HOMES BUILDING CO.,
L.L.C.,

*Debtor.*

_____

KEVIN ADELL,

*Plaintiff-Appellant,*

*v.*

JOHN RICHARDS HOMES BUILDING CO., L.L.C.,

*Defendant-Appellee.*

No. 04-2154

>

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 03-40109—Paul V. Gadola, District Judge.

Argued:  June 8, 2005

Decided and Filed:  March 1, 2006

Before:  NELSON and CLAY, Circuit Judges; OBERDORFER, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  G. Eric Brunstad, Jr., BINGHAM McCUTCHEN LLP, Hartford, Connecticut, for Appellant.  Norman C. Ankers, HONIGAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellee.  **ON BRIEF:**  G. Eric Brunstad, Jr., BINGHAM McCUTCHEN LLP, Hartford, Connecticut, Ralph E. McDowell, Michael B. Lewiston, Robert J. Diehl, Jr., BODMAN LLP, Detroit, Michigan, for Appellant.  Norman C. Ankers, Judy B. Calton, HONIGAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, Ruth Zimmerman, HONIGMAN, MILLER, SCHWARTZ & COHN, Lansing, Michigan, for Appellee.

_____

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

---

**OPINION**

---

OBERDORFER, District Judge.  After dismissing the involuntary bankruptcy petition filed by Kevin Adell against John Richards Homes Building Co., L.L.C. ("JRH"), the bankruptcy court found that the petition was filed in bad faith and awarded JRH costs, attorneys' fees, compensatory damages and punitive damages pursuant to 11 U.S.C. § 303(i) of the United States Bankruptcy Code.  The district court affirmed that award.  Adell now appeals that affirmance.  Finding no error in the bankruptcy court's award or the district court's approval of it, we AFFIRM.

## I.  BACKGROUND

We set forth here an abbreviated version of the material events addressed by the bankruptcy court in adjudicating the merits of JRH's claim that Adell's petition for involuntary bankruptcy was in bad faith.  A separate Appendix expands on these facts and summarizes more extensively the facts relating to the court's assessment of compensatory and punitive damages.

As the bankruptcy court found, in December 2001, Adell and JRH entered into a Residential Building and Purchase Agreement whereby JRH, in exchange for $3,030,000, agreed to sell Adell a 1.8 acre parcel of property in Bloomfield Hills, Michigan, and to construct a home for Adell on the property, with construction to begin "within a reasonable time after the completion of building plans and issuance of permits."  Appendix ¶¶ 1-3.   On February 28, 2002, the deal closed.  The closing documents allocated $1,750,000 out of the $3,030,000 for the land purchase.  *Id*. ¶ 4.

Over the next few months, Adell's relationship with JRH and its principal, John Shekerjian, soured.  *Id*. ¶¶ 5-8.  Adell began to complain about the pace of construction on his home and to contact JRH's former employees seeking negative information about JRH.  He told Shekerjian that he wanted another builder to build his house and, apparently, barred JRH from the property.  He also became upset about the amount he had paid for the land, contending that it was only worth $1 million instead of $1.75 million.

On June 6, 2002, after a number of conversations, meetings, letters and other interactions between Adell or his representatives and JRH or its representatives, Adell filed a civil suit against JRH and Shekerjian in the Oakland County Circuit Court.  *Id*. ¶¶ 9, 10, 11, 12, 13, 14.   The complaint included a number of claims, all of which essentially rested on two allegations: (1) that Shekerjian and JRH had *orally* told Adell that the land was worth $1,000,000, and that the home they would construct for him would have a value of $2,000,000, despite the fact that the executed sale documents allocated $1,750,000 to the value of the land, leaving at most $1,280,000 for the home construction; and (2) that Shekerjian for JRH had told Adell that construction would begin immediately after the sale closed, even though they knew that was impossible because there were "water problems" with the property, and that the resulting delay in commencing construction was not "reasonable."  On June 18, 2002, JRH and Shekerjian jointly filed an answer, denying the substance of all of Adell's claims, stating affirmative defenses, and including a verified counter-complaint.  *Id*. ¶ 18.

During the time between when Adell filed his state court civil suit and JRH and Shekerjian filed their responsive pleadings, Adell contacted at least two of JRH's contractors, telling them that JRH was in financial trouble and trying to persuade them to join him in filing an involuntary bankruptcy petition against JRH.  *Id*. ¶¶15-16.  Both refused.  *Id.*

On June 24, 2002, less than a week after JRH and Shekerjian filed their responses in the state court case and without any further discussion or communication, Adell, as the sole petitioning

creditor, filed an involuntary bankruptcy petition against JRH pursuant to 11 U.S.C. § 303(b)(2). *Id.* ¶ 20. According to the petition, Adell's own claim against JRH for fraud and breach of contract was in the amount of $800,000. *Id.* Adell sought to maximize the publicity attending his filing by hiring a public relations firm, Marx Layne, to publicize alleged defects in JRH's performance of its construction and financial obligations. *Id.* ¶¶ 21-22.

On July 1, 2002, JRH filed a motion to dismiss the petition. JA 30-32. Noting that Adell's claim against JRH cited in the petition was also the basis for Adell's state court civil complaint against JRH and Shekerjian, and that JRH and Shekerjian had recently filed pleadings denying all of Adell's claims, JRH argued that Adell's claim was the subject of a "bona fide dispute," precluding its use as the basis for the petition. JA 30. JRH also argued that Adell was required to have at least three petitioning creditors because JRH was an entity with 12 or more creditors. JA 31. Should the petition be dismissed, JRH asked the bankruptcy court to award it fees, costs and damages pursuant to 11 U.S.C. § 303(i). JA 31. On July 12, 2002, Adell's bankruptcy attorneys filed a notice that three additional creditors had joined in the filing of the petition. JA 33.

On July 15, 2002, the bankruptcy court held a hearing on JRH's motion to dismiss. Ruling from the bench, the court granted the motion, concluding that Adell was not qualified to serve as a creditor in an involuntary bankruptcy because his claim against JRH was not undisputed. The court explained:

> The record that is before the Court overwhelmingly establishes that there is a bona fide dispute concerning this petitioning creditor's claim against the Alleged Debtor . . . [and]
>
> . . . that there are significant genuine issues of material fact concerning any disposition of the issues raised in the [state court case], . . . such fundamental issues as which of the parties breached the contract, which of the parties was the first to breach the contract. There are clear issues of fact concerning particularly the fraud claim and the statutory claim.

JA 71-72. Having rejected the sole petitioning creditor, Adell, the bankruptcy court ruled that it could not permit the joinder of other putative creditors. JA 74. Adell did not appeal the bankruptcy court's dismissal of the petition.

After a period of discovery, followed by a two-day evidentiary hearing, the bankruptcy court granted JRH's motion on April 25, 2003.[1] In a thorough opinion, the court found that Adell filed the involuntary bankruptcy petition against JRH in bad faith and awarded JRH compensatory damages in the amount of $4,100,000, punitive damages in the amount of $2,000,000, and attorneys' fees and costs in the amount of $313,230.68. JA 195-218.

Adell appealed to the district court. On August 5, 2004, in another thorough opinion, the district court ratified the bankruptcy court decision. JA 296-330. Adell then filed the present appeal.

---

[1]The bankruptcy court imposed a strict four-hour time limit on each side (including both direct and cross-examination).

## II.  DISCUSSION

### A.   Legal Standards

Section 303(i) of the Bankruptcy Code provides:

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment--

(1) against the petitioners and in favor of the debtor for--

(A) costs;  or

(B) a reasonable attorney's fee;  or

(2) against any petitioner that filed the petition in bad faith, for--

(A) any damages proximately caused by such filing;  or

(B) punitive damages.

11 U.S.C. § 303(i).  Applying this provision, the bankruptcy court in the present case determined that Adell filed his involuntary bankruptcy petition against JRH in bad faith and awarded JRH costs, fees, and damages.  On appeal, Adell challenges all aspects of the bankruptcy court's decision: (1) its finding that he filed the involuntary bankruptcy petition in bad faith; (2) its award of $4.1 million in compensatory damages; (3) its award of $2 million in punitive damages; and (4) its award of costs and attorneys' fees.

We review the bankruptcy court's findings of fact for clear error and any conclusions of law *de novo.  In re Baker & Getty Fin. Servs., Inc.*, 106 F.3d 1255, 1259 (6th Cir. 1997).  We evaluate the bankruptcy court decision directly, without being bound by the district court's determinations, and conduct an independent examination of the record.  *In re Charfoos*, 979 F.2d 390, 392 (6th Cir. 1992).  "We will not disturb the bankruptcy court's findings of fact unless there is the "most cogent evidence of mistake of justice."  *In re Baker*, 106 F.3d at 1259.

### B.   Bad Faith

Adell seeks to reverse the bankruptcy court's finding that he filed the involuntary petition against JRH in bad faith.  A bankruptcy court's determination that an involuntary petition was filed in bad faith is a question of fact which will be reversed only if clearly erroneous.  *See In re Washtenaw/Huron Inv. Corp. No. 8,* 160 B.R. 74, 79 (E.D. Mich.1993); *In re Landmark Distribs., Inc.,* 189 B.R. 290, 309 (Bankr. D.N.J.1995).

As the bankruptcy court in the present case recognized, "[t]here is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." *In re John Richard Homes Building Co.* ("Bankruptcy Op."), 291 B.R. 727, 729-30 (Bankr. E.D. Mich. 2003) (internal quotations omitted).   Although this Court has never directly addressed the standard for determining bad faith under § 303(i), the bankruptcy court and the district court both concluded, and we agree, that determining whether an involuntary bankruptcy petition was filed in bad faith requires the bankruptcy court to look at the "totality of circumstances." *Id.*; *see also In re Cadillac by DeLorean & DeLorean Cadillac, Inc.,* 265 B.R. 574, 582 (Bankr. N.D. Ohio 2001) (applying totality of circumstances test to assess bad faith under section 303(i) (citing *In re Caldwell*, 851 F.2d 852, 858 (6th Cir.1988) (applying totality of circumstances test to different

provision of the Bankruptcy Code); *In re Zick*, 931 F.2d 1124, 1127-28 (6th Cir.1991) (same); *In re Okoreeh-Baah*, 836 F.2d 1030, 1033 (6th Cir.1988) (same)).[2]

### 1.     Evidence

In order to prove Adell's bad faith, JRH introduced testimony and other evidence that:

• Even though JRH quickly resolved Adell's first complaint about the pace of construction – that the "dewatering" of Adell's site had temporarily ceased – by obtaining the permits needed to "dewater" through the night, Adell's very next action was to tell Shekerjian that he wanted someone else to build his home.  Appendix ¶ 5.

• Shortly after the dewatering episode, Adell told Shekerjian about a prior dispute Adell had had over a building permit and how Adell had retaliated against the village with whom he had the dispute, implying to Shekerjian that Adell was the type of person who was likely to respond very aggressively to anyone who didn't do what he wanted.  *Id.* ¶ 6.

• On May 31, 2002, before any serious discussion had occurred between Adell and JRH about Adell's complaints, Adell's attorney threatened Shekerjian with criminal prosecution if JRH didn't meet Adell's demands.  *Id.* ¶ 10.

• JRH first learned that Adell thought he had paid too much for the property on June 3, 2002. On several occasions thereafter, before the petition was filed, JRH or its representatives advised Adell or his representatives that it was JRH's position that the land had been properly valued at the closing and that an independent investigation by Adell or his attorneys of land values in Bloomfield Hills would confirm that fact.  *Id.* ¶ 11, 13(b).

• As soon as Shekerjian learned that Adell thought the land was only worth $1,000,000, he offered to buy the property back.  Adell refused the offer, yet then threatened to file an involuntary bankruptcy petition against JRH.  *Id.* ¶ 12.

• At the June 3 meeting and on several occasions thereafter, JRH's representatives informed Adell that it was JRH's position that filing an involuntary bankruptcy petition would be improper. *Id.* ¶¶ 12, 13(a), 17, 19.

• On several occasions before the petition was filed, JRH's representatives informed Adell or his representatives that JRH disputed Adell's claim that the construction pace was too slow and that JRH considered Adell to be the one in breach of the construction agreement.  *Id.* ¶¶ 13(b), 18.

• Adell ignored JRH's attempts to settle the matter before litigation.  *Id.* ¶¶ 13(c), 14.

---

[2]In looking at the totality of the circumstances, there are various definitions of bad faith that a court might consider:

> (1) an "improper use" test under which bad faith is found based on creditor attempts to obtain disproportionate advantage by means of an involuntary filing; (2) an "improper purpose" test under which bad faith is found when an involuntary filing is made based on ill-will, malice, or a desire to embarrass or harass the alleged debtor; and (3) a bad faith inquiry based on the standards set forth in Bankruptcy Rule 9011.

*In re Cadillac*, 265 B.R. at 583.

• While Adell's state court suit against JRH was pending, he contacted several JRH contractors trying (unsuccessfully) to get them to join him in filing an involuntary bankruptcy petition. *Id*. ¶¶ 15, 16.

• Adell knew at the time he filed the petition that it was critical that he have an undisputed claim of over $12,000 against JRH. *Id*. ¶ 2.

• Adell's bankruptcy attorneys filed the petition without obtaining several documents (of which Adell was or should have been aware) that would have alerted them to the fact that JRH disputed all of Adell's claims. *Id*.

• Adell sought to publicize the filing of the involuntary bankruptcy petition and to spread misinformation about JRH. For example, at his behest, his public relations firm misrepresented to various media publications that JRH had at least nine dissatisfied customers, when, in fact, at least two of the nine, Jean McIntyre and Larry Gainer, definitely had no problems with JRH; there is no showing that any of the other seven did either. *Id*. ¶¶ 22, 23.

Adell responded with testimony and evidence that:

• Prior to filing the petition, he had learned from two former JRH employees, Debra Lee Bjorkly and William Seklar, that JRH was in dire financial straits. *Id*. ¶¶ 7,8.

• Prior to filing the petition, he had also learned from Bjorkly and Seklar that Shekerjian was aware of the water problem on his property when he sold the land to Adell and knew that building on it would be problematic. *Id*. ¶¶ 7,8.

• He believed when he filed the petition that he had an undisputed claim of at least $133,000, the amount out of the total paid by Adell that he believed had been allocated for home construction. JA 911.

• At the time the petition was filed, he was unaware that JRH and Shekerjian had filed an answer and other responses to his civil complaint denying all of his claims. JA 927.

• Prior to filing the petition, Shekerjian had admitted that he owed Adell money, but that he did not have the money to refund to him. JA 921-22.

• He was not motivated by malice or by a desire to put JRH out of business. JA 917.

• He did not seek to publicize the bankruptcy. JA 918.

• He did not threaten other creditors in order to persuade them to join the petition. JA 920.

On rebuttal, JRH offered testimony and evidence that:

• JRH was not in financial difficulty. JA 974-75.

• Bjorkly and Seklar, the only two former JRH employees who testified for Adell, had personal grievances against JRH and Shekerjian and their testimony was not credible. JA 972-979.

• Bjorkly and Seklar are the only two former employees Shekerjian has ever litigated against. JA 978.

## 2.      Bankruptcy Court's Decision

The bankruptcy court concluded that Adell filed the petition in bad faith, finding the evidence of bad faith "overwhelming."  Bankruptcy Op., 291 B.R. at 731.  It explained:

> The totality of the circumstances compels the conclusion that Adell did not honestly believe that the involuntary bankruptcy petition would be appropriate.  Adell did not file this petition in a sincere and honest belief that he was entitled to bankruptcy relief against JRH. Rather, he proceeded with the wrongful intent to intimidate Shekerjian into a settlement and, when that failed, to damage or destroy his business.

*Id.* at 735.

## 3.      Analysis

The bankruptcy court made seven specific findings in support of its ultimate finding of bad faith. *Id.* at 731-35.  Adell first attempts to show that the bankruptcy court's ultimate finding of bad faith was clearly erroneous by challenging each of these underlying findings – either as clearly erroneous or immaterial or both; in the alternative, he argues that there is evidence of good faith that outweighs any evidence of bad faith.   We will address each argument in turn.

### a.      Finding that Adell knew or should have known that his claim was disputed

The bankruptcy court found that "on July 15, 2002, when Adell filed this involuntary bankruptcy petition, he knew or should have known that his claims were the subject of a bona fide dispute" because "[b]y then, JRH had responded to Adell's state court complaint by filing substantial defenses, affirmative defenses and counterclaims." *Id.* at 731.  Adell challenges this finding by citing his own testimony to the contrary, JA 909-17, and by arguing that Shekerjian conceded that at least $133,000 of the money Adell had paid was for construction costs and, therefore, should have been held in trust for him, JA 676-69.

While it is true that Adell testified that he did not know his claim was disputed, the bankruptcy court found that testimony not credible or, even if true, the result of unjustifiable ignorance. Bankruptcy Op., 291 B.R. at 731-32.  As explained by the bankruptcy court:

> Adell testified that he was not aware of these responsive pleadings until after the involuntary bankruptcy petition was filed.  There are four problems with this position:
>
> First, his state court attorneys were aware of these pleadings before the petition was filed.  His attorneys' failure to advise him of them in a timely way can be of no help to him.
>
> Second, the nature of Adell's claims was such that he would certainly not require legal advice to understand that he and JRH would have real and substantial legal and factual disputes, and further that the litigation to resolve these disputes would be lengthy and costly.  Even before JRH filed responsive pleadings, Adell could not have reasonably concluded that JRH would simply admit that it had committed the frauds and the other intentional wrongs that he had alleged.
>
> Third, the evidence establishes that even if Adell was not aware of JRH's responsive pleadings, he already knew that his state court claims would be contested. At least twice before Adell filed the involuntary petition, JRH's attorneys

specifically told Adell's attorneys that JRH would contest Adell's claims and that therefore an involuntary petition would be improper. . . .

Fourth, Adell took no action to withdraw the involuntary petition when he did become aware of JRH's state court responses.

*Id.* (internal citations omitted).  As Adell makes no attempt to challenge the probative value of the evidence cited by the bankruptcy court or to challenge the bankruptcy court's use of that evidence in support of its finding, and especially in light of the special deference given to a trial judge's credibility findings, we cannot conclude that the bankruptcy court clearly erred in rejecting Adell's testimony.

Adell's second argument is that there was no bona fide dispute with respect to at least $133,000 and, therefore, no basis for finding that Adell knew or should have known that his claim was subject to a bona fide dispute.  There are numerous problems with this argument. First, even if Shekerjian conceded he was holding at least $133,000 in trust for Adell, he never conceded that Adell's claim to that money was undisputed.  Second, the question whether Adell's claim was subject to a bona fide dispute was resolved by the bankruptcy court's decision in July 2002 dismissing the petition, a decision which Adell did not appeal.  Thus, Adell cannot now argue that, in fact, there was a bona fide dispute.  Finally, while it is certainly possible that a creditor could reasonably but erroneously believe there was no bona fide dispute, Adell is not that creditor.  As the district court concluded, Adell's alleged good faith belief that the $133,000 was undisputed was clearly "manufactured after the fact," as shown by the fact that it was never mentioned by his attorneys during the motion to dismiss hearing.

As neither of Adell's two challenges to the bankruptcy court's first finding have merit, we conclude that it did not clearly err in finding that Adell knew or should have known at the time he filed the petition that his claim was subject to a bona fide dispute.

### b.     Finding that Adell knew the petition would harm JRH and intended that harm

The bankruptcy court found that "Adell knew of the serious harm that JRH would suffer as a direct consequence of the involuntary filing" and that "Adell intended to cause that harm."  *Id.* at 732.  Adell first argues that this finding is immaterial to the issue of bad faith as long as Adell reasonably believed that JRH belonged in bankruptcy.  He also disputes the finding itself by citing his own testimony that he never threatened to commence a bankruptcy, JA 917, and that he did not hire his public relations firm, Marx Layne, for the purpose of publicizing the bankruptcy, JA 918.

As discussed above, the bankruptcy court found, and we have upheld its finding, that Adell knew or should have known that his claim against JRH was the subject of a bona fide dispute.  It necessarily follows that Adell knew or should have known that JRH did not belong in bankruptcy. Accordingly, his claim on appeal that he reasonably believed JRH belonged in bankruptcy is plainly without merit.

Adell testified that he never threatened JRH with bankruptcy and that he did not hire Marx Layne to publicize the bankruptcy but rather to defend against inquiries about the civil case. JA 918.  However, the bankruptcy court heard his testimony and found it not credible on both points. Bankruptcy Op., 291 B.R. at 732-33.  The bankruptcy court's explanation of why it found Adell's testimony not credible on these two points is extensive and supported by substantial evidence that Adell does not address. *Id.* at 732.  Accordingly, we see no error in the bankruptcy court's rejection of Adell's testimony on these two points and, accordingly, no basis for disturbing its finding that Adell knew the filing would cause JRH harm and intended that harm.

**c.      Finding that Adell's attorney threatened Shekerjian with criminal prosecution**

The bankruptcy court found that Adell's attorney in his civil matter, Dennis Dlugokinski, had on several occasions "outrageously threaten[ed] *criminal prosecution*" unless Shekerjian agreed to remove any mortgages and liens on the property, to cancel any debt owing by Adell, and to make restitution and pay damages. *Id*. at 733. On appeal, Adell does not challenge the accuracy of this finding, but he argues that it is immaterial to the question of whether Adell reasonably believed he could file the involuntary petition. We disagree. Given that the standard for judging bad faith is the "totality of the circumstances," the fact that Adell was issuing such threats in a civil suit involving the same issues is certainly a fact that the bankruptcy court may properly consider.

**d.      Finding that Adell was unable to explain how he calculated the $800,000 figure in the involuntary bankruptcy petition**

The bankruptcy court found that "Adell was unable to articulate" how the $800,000 figure in the involuntary bankruptcy petition was calculated. *Id*. On appeal, Adell challenges this finding by citing his own testimony that he arrived at the $800,000 figure by subtracting the value of the land, $1 million, from the total amount he had already paid, $1.8 million, JA 909-17, and the testimony of Max Newman, one of his bankruptcy attorneys. JA 940. Despite Adell's trial testimony, the bankruptcy court's finding is not clearly erroneous. At Adell's deposition in August 2002, a short time after the petition had been filed, he testified that he didn't know how he arrived at $800,000 and that he had relied on his bankruptcy attorneys to determine the amount listed in the petition. JA 929. Presumably the bankruptcy court based its finding on Adell's deposition testimony, impliedly finding it credible and Adell's trial testimony not credible. *See* Wright & Miller, Federal Practice & Procedure: Civil 2d § 2579 (where a lower court has "fail[ed] to make a finding on a particular fact," the court is presumed to have "impliedly made a finding consistent with its general finding"). Absent a reason for rejecting this omnibus credibility finding, Adell's challenge to the bankruptcy court's specific finding that Adell was unable to articulate the basis for the $800,000 debt alleged in the involuntary bankruptcy petition fails.

**e.      Finding that Adell flaunted his wealth and threatened other creditors**

The bankruptcy court found that "Adell used improper threats and flaunted his wealth in an attempt to solicit creditors to join his petition." Bankruptcy Op., 291 B.R. at 733. On appeal, Adell challenges this finding by citing his own testimony to the contrary. JA 851-55, 920.

In making its finding, the bankruptcy court relied on the testimony of two JRH creditors, Cynthia Weaver and Robert Clark. Bankruptcy Op., 291 B.R. at 733; *see also* Appendix ¶¶ 15, 16. The court credited their testimony and rejected Adell's testimony to the contrary. *Id.* Adell has not offered any reason, and none is apparent, why we should conclude that the bankruptcy court clearly erred by crediting the testimony of the two creditors over Adell's own self-serving testimony.

Adell also argues that even if true, this finding is "irrelevant" to the issue of bad faith. Again, the "totality of the circumstances" test renders that a difficult argument to support. We have no difficulty in concluding that the bankruptcy court correctly ruled that Adell's flaunting of his wealth and threatening other creditors is relevant to a determination as to whether the petition was filed in bad faith.

**f.      Finding that Adell's reliance-on-counsel defense is not persuasive**

The bankruptcy court found that Adell's testimony that he filed the petition in "reliance on the advice of experienced bankruptcy attorneys . . . must be rejected" because of Adell's failure to

fully disclose all relevant information to his bankruptcy counsel, Newman. *Id.* As explained by the bankruptcy court, Adell and his other attorneys

> withheld from Newman significant information that plainly would have, or should have, made a difference on the critical issue of whether JRH either "admitted," or at least did not dispute, any portion of Adell's claim."

*Id.*

Adell does not dispute the legal rule, articulated by the bankruptcy court, that "a client reasonably relies on an attorney's advice only when the client provides to the attorney all of the pertinent facts in the client's possession." *Id.* at 734-35 (internal quotations omitted). Nor does he challenge the bankruptcy court's conclusion that he failed to disclose *certain* information to his bankruptcy attorneys.[3] He does contend that he fully disclosed all the *relevant* facts and, therefore, that his reliance-on-counsel defense should not have been rejected. We disagree. Adell's bankruptcy attorney testified that in filing the petition he had relied on Adell's (and his attorney's) representation that there was an undisputed claim over $12,000, and that he was unaware of several key documents, which he would like to have seen. JA 940, 945. Under those circumstances, a reliance-on-counsel defense is not viable. As the bankruptcy court explained:

> Newman's advice that an involuntary petition would be proper was based on Adell's assurance that JRH would admit a claim of at least $12,000. However, as found above, Adell knew that JRH would vigorously dispute his claim and therefore that this assurance was false. Moreover, Newman certainly would have determined that the assurance was false if only Adell had not withheld pertinent facts and documents. Accordingly, Adell's defense of reliance on counsel must be rejected.

*Id.* at 735. We also agree with the bankruptcy court that "Adell's conduct in deliberately withholding evidence from his bankruptcy counsel is further evidence of his bad faith in causing the involuntary petition to be filed." *Id.*

### g.        Finding that Adell did not file out of concern for other creditors

The bankruptcy court found that "Adell falsely testified that in filing the involuntary petition, he was motivated by a concern for JRH's trade creditors," explaining that "[i]f he were indeed so charitably motivated, he would not have threatened at least two creditors that the only way they would be paid would be to join in the petition." *Id.* Adell first challenges the finding that he threatened at least two creditors by citing his own, Mark Layne's (the head of the public relations firm, Marx Layne) and Bjorkly's testimony to the contrary. *See* JA 562, 853-54, 896. Here again, Adell fails to offer any basis for rejecting as clearly erroneous the bankruptcy court's decision to credit the testimony of Weaver and Clark, *see* Appendix ¶¶ 15, 16, over the testimony of Adell, Bjorkly and Layne.

Adell also argues that even if he did say it, it was not a threat but simply the truth, and, therefore, irrelevant to the question of bad faith. As discussed above, however, a bankruptcy court

---

[3] The bankruptcy court found that there were three material items that neither Adell nor his attorneys provided to Newman: (1) a June 5, 2002 letter from one of JRH's attorneys, E. Michael Morris, to Dlugokinski, "in which Morris clearly took the position that Adell had explicitly agreed to the purchase price of $1,750,000 for the real property and that it was Adell, not JRH, that was in breach of the construction contract"; (2) another June 5, 2002 letter from Morris to Dlugokinski "in which Morris demanded that Adell cease disparaging JRH and cease soliciting creditors for an involuntary bankruptcy petition" and threatened "severe sanctions for damages in the event it files a frivolous petition for bankruptcy"; and (3) "most inexplicably of all . . . a copy of JRH's answer to Adell's state court complaint or JRH's counterclaim." *Id.*

looking at the totality of the circumstances in order to decide whether an involuntary bankruptcy petition has been filed in bad faith is entitled to consider the fact that the petitioning creditor apparently (or at least arguably) was making threats to other creditors prior to filing the petition.

### h.          Evidence of Good Faith

Adell argues that even if none of the bankruptcy court's findings that underlie its ultimate finding of bad faith were clearly erroneous, it erred by failing to give due consideration to the evidence in the record of Adell's good faith. He argues that if the evidence of his good faith had been properly considered, it would have outweighed the evidence of bad faith.

Adell points to the following evidence in the record as evidence of his good faith:

• Bjorkly's testimony that she told Adell that JRH was not paying its trade creditors and that other customers were having liens placed on their homes, that she told Adell that everyone at JRH knew there was a serious water issue, and that she told Adell that Shekerjian had told her he was going to "screw" Adell on the cabinet prices, JA 887-893.

• Adell and his bankruptcy counsel's testimony that counsel had told Adell that Adell's money had been transferred to another entity and was probably being dissipated, JA 913, 938.

• Adell's counsel's testimony that he told Adell that JRH was probably insolvent, JA 938.

• Adell's testimony that Shekerjian admitted owing him money and told him he couldn't give him a refund or start building, JA 912-13, 921-22, that no progress was being made on the home, JA 923, 965, and that his bankruptcy counsel advised him to file the petition and that he relied on their advice in signing it, JA 914-15.

• The testimony of Adell, Layne and Bjorkly that Adell was filing out of concern for other creditors, JA 562, 853-54, 896.

As explained above, the bankruptcy court found, and we see no basis for disturbing those findings, that much of the testimony cited by Adell as evidence of good faith was not credible. Even without that problem, in weighing the purported evidence of good faith identified by Adell against the "overwhelming" evidence of bad faith relied on by the bankruptcy court, we conclude that the finding that Adell filed the petition in bad faith was not clearly erroneous.

## C.          Amount of Compensatory Damages

Having found no error in the bankruptcy court's determination that Adell filed the petition against JRH in bad faith, we turn to Adell's challenges to the compensatory damages award. Under 11 U.S.C. § 303(i) a bankruptcy court has the discretion to award compensatory damages for the injuries proximately caused by the bad faith filing of an involuntary bankruptcy petition. Here, the bankruptcy court found that the negative publicity surrounding the filing damaged JRH's future business. Bankruptcy Op., 291 B.R. at 735. It then determined that JRH's lost future profits, "calculable with a reasonable degree of certainty," totaled $4,100,000, based on an estimated loss of 20 home sales over the next five years (a 50% decline in sales) at an average sales price of $1.9 million and an incremental profit margin of 17%. *Id.* at 735-36. On appeal, Adell challenges both the bankruptcy court's proximate cause finding and the amount of its damages award. We review for clear error.

### 1.      Proximate Cause ("Fact" of Damage)

Under section 303(i) of the Bankruptcy Code, the alleged debtor may recover damages "proximately caused" by the bad faith filing of an involuntary bankruptcy petition. Adell contends that the bankruptcy court "assumed" that the filing would be the proximate cause of future lost profits, but that there is not enough evidence in the record to justify that assumption. He emphasizes that JRH failed to offer expert witness testimony on the effects of negative publicity and, citing *In re Cadillac by DeLorean*, 265 B.R. 574, 584 (Bankr. N.D. Ohio 2001), that lost profits "must be proven through more than general testimony about reaction within the community." We review these factual findings for clear error. *Huss v. King Co., Inc.*, 338 F.3d 647, 652 (6th Cir. 2003).

The record is not as barren as Adell suggests. Shekerjian testified that JRH was "totally devastated" by the petition and that shortly after the petition was filed JRH lost two high-end contracts. JA 627, 630, 632, 665. He also testified that in the six months between when the petition was filed and the bankruptcy court hearing JRH did not sell a single home. JA 627. Finally, he testified that a builder's reputation was "absolutely critical" to selling homes in the high-end market. JA 632. Considering this testimony, the bankruptcy court found that "Shekerjian credibly testified that the ability of JRH to compete in the market for high end homes is critically affected by its reputation." Bankruptcy Op., 291 B.R. at 735.

In addition, David Johnson, a local real estate developer in the high-end market, testified that the petition greatly affected JRH's ability to sell homes in that market. JA 510-11. In the six months after the filing, he testified, JRH's financial stability was a recurring topic of discussion at the various events Johnson sponsored. JA 511. In addition, while during that period there were housing starts in his development by other builders, there were none by JRH. JA 511. As he explained it, "[t]he most important thing in the cosmic value and super-lux marketplace, and what has been the foundation of my reputation, is integrity, reliability and predictability." JA 510.

The foregoing considered, JRH was under no obligation to present an expert on this issue. Accordingly, we reject Adell's contention that the bankruptcy court clearly erred in finding that the record evidence establishes that the filing was the proximate cause of damage to JRH.

### 2.      Amount of Damages

Adell also challenges the amount of compensatory damages awarded. In finding that JRH was "entitled to an award of compensatory damages in the amount of $4,100,000," the bankruptcy court credited the testimony of JRH's expert, Frazee, explaining:

> The Court finds that Frazee's calculation of lost profits and the assumptions on which that calculation is based are entirely reasonable. Frazee testified with credibility. His expertise and methodology were not undermined in any substantial way. His assumptions were supported by other credible evidence. His calculation of JRH's damages is to a reasonable degree of certainty in the circumstances. Any lingering uncertainty about the calculation of lost profits is a result of Adell's own conduct in filing the improper bankruptcy petition and thus must not be permitted to prejudice JRH.

Bankruptcy Op., 291 B.R. at 736. On appeal, Adell contends that the bankruptcy court erred by (1) accepting the expert's use of the past profits of other Shekerjian entities that had operated in the high-end market (the "Affiliates") as a reasonable basis for estimating JRH's expected future profits; (2) accepting the expert's representation that the Affiliates had a historical profit margin of 17% even though there was no evidence in the record to support that figure; (3) accepting the expert's assumption that absent the filing of the petition JRH's sales would have continued at the same rate in the future; and (4) accepting the expert's assumption that JRH would lose precisely four (4) sales

per year for a five-year period.  Once the fact of damage is established, the amount of damage need only be proved to a reasonable degree of certainty, and our review of this factual determination is for clear error.

### a.     Expert's Use of the Affiliates' Past Business as Basis for Calculating JRH's Estimated Future Lost Profits

In order to estimate JRH's future lost profits, and because JRH itself had only been created in January 2001, JRH's expert relied in part on the past business records of the Affiliates.   On appeal, Adell argues that by accepting the expert's use of the past business of the Affiliates to calculate JRH's future lost profits, the bankruptcy court effectively (and illegitimately) allowed JRH to be compensated for the Affiliates' lost future profits.  While only JRH's future lost profits are compensable, that does not necessarily mean that the past business of the Affiliates is irrelevant.

In the present case, Shekerjian testified that JRH was created in early 2001 in order to consolidate in one entity the high-end home building business that had previously been handled by the Affiliates.  JA 623.  He also testified that as part of the formation of JRH, he had phased out a number of the Affiliates, and others were set to be phased out as soon as their ongoing projects were completed.  JA 624.  Thus, he opined, Frazee's use of historical sales data from the Affiliates was a "reasonable" predictor of JRH's potential future earnings because the business of those entities was "being funneled into [JRH] going forward."  JA 634-35.  Frazee testified that given JRH's recent creation, the best evidence of its future profits was the past profits of the Affiliates, whose business it was taking over.  JA 610.  This record evidence supports the bankruptcy court's decision to accept the use of the past business of the Affiliates as a basis for estimating JRH's lost future profits.  Adell's charge of clear error on this ground thus fails.

### b.     Record Evidence of Affiliates' Past Profits

In estimating JRH's future lost profits, Frazee testified that he used a 17% profit margin because that was the historic profit margin of the Affiliates for high-end homes constructed in the past five years.  JA 576-79.  Frazee testified that he calculated the 17% figure by reviewing a number of documents provided to him by JRH. On appeal, Adell argues the bankruptcy court should not have accepted that testimony absent actual evidence in the record of the Affiliates' past profits.

While expert testimony may not be used to establish underlying facts not otherwise in evidence, *see In re James Wilson Assocs.*, 965 F.2d 172-72 (7th Cir. 1992), that is not what happened here.  Rather, JRH's expert utilized the past profits of the Affiliates to estimate JRH's future lost profits and then testified accordingly.  The bankrtuptcy court relied on the testimony of JRH's expert in calculating JRH's damages, which JRH bore the burden of proving to a reasonable degree of certainty.  Had JRH had an independent need to prove the past profits of the Affiliates, the present record might be inadequate.  However, it did not.   Indeed, Federal Rule of Evidence 705 expressly contemplates that an expert may offer an opinion without the record containing all of the underlying facts on which that opinion is based:

> The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise.  The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Fed. R. Evid. 705.  Thus, an opposing party who would challenge the facts underlying the expert's opinion must do so by cross-examination. *See Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 544-45 (1st Cir. 1988); *see also Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir. 1980) (holding that the effect of Rules 703 and 705 is to "place the full burden of

exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination").

### c.          Record Evidence to Support Assumption of Continued Sales at the Same Rate for the Next Five Years

In estimating JRH's future lost profits, Frazee assumed that, absent the petition, sales would have continued at the same rate for the next five years. On appeal, Adell contends that the record does not support this assumption. In support, he cites the testimony of Bjorkly and Seklar, both of whom testified that JRH and/or the Affiliates' sales were decreasing before the filing of the petition. Adell also asserts that JRH should have proffered an expert on market conditions in order to justify this assumption. His contention is not persuasive. First, the bankruptcy court impliedly found the testimony of Bjorkly and Seklar not credible; a finding that is justified given Shekerjian's testimony that JRH's sales had not been declining. *See* JA 977. Second, although JRH did not have an expert on market conditions, both Shekerjian and Johnson testified that the market for luxury homes had not been affected by the general market downturn. *See* JA 512, 626-27, 641. This record evidence is more than adequate to support a conclusion that the decision of the bankruptcy court to accept the expert's assumption of continued sales at the same rate was not clearly erroneous.

### d.          Evidence Supporting Assumption of Loss of Four Sales Per Year for Five Years

Finally, Adell contends that there is no evidence supporting JRH's expert's assumption that JRH would lose four sales per year (50%) for the next five years, but that is simply not true. Frazee's assumption is supported by Shekerjian's testimony that he thought a 50% reduction over five years was reasonable and, if anything, conservative, given the nature of the high-end home business. JA 636-37. Specifically, Shekerjian testified that Frazee's assumption that JRH would lose four home sales per year for the next five years due to the filing of the petition was "extremely conservative" because:

• "this is something that people won't forget," JA 636;

• Frazee excluded several very expensive homes from his calculation of the total number of homes sold over the previous five years, JA 637;

• JRH had sold zero homes since the bankruptcy filing, although 50 permits for high-end homes in the relevant area had been issued during that six-month period, JA 637, 641;

• high-end sales are primarily driven by the "ripple effect" – that is, sales lead to people talking, leading to more sales; any negative publicity is potentially devastating and with respect to JRH the "buzz in the marketplace [wa]s . . . quite prominent," JA 637, 639;

• Shekerjian's plan for JRH in the future, as evidenced by JRH's heavy investment in land in the Turtle Lake development (over $4 million), had been to double the number of high-end homes sold per year, JA 638.

In addition, as described above, Johnson testified, based on his personal observations of the market, that JRH's ability to sell homes had been negatively affected by the petition. JA 508-512. More generally, estimating future lost profits is necessarily imprecise. Here the record adequately supports the assumption that JRH would lose four home sales per year for five years following the filing of the petition. Even if that assumption turned out to be wrong, the damages award might still be conservative because, as Shekerjian testified, it does not include the money JRH had spent and would continue to spend to try to repair its reputation and its banking and accounting relationships,

JA 637-38, and it does not include the money JRH had invested in land hoping to increase the number of high-end homes it built in the future, JA 638-39.

**D.      Punitive Damages**

Adell seeks to overturn the bankruptcy court's $2,000,000 punitive damages award. He challenges the award on both constitutional and non-constitutional grounds. We apply *de novo* review to the constitutional challenge, but otherwise review only for abuse of discretion. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433, 436 (2001); *Smoot v. United Transp. Union*, 246 F.3d 633, 647-48 (6th Cir. 2001). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.* (quoting *Owner-Operator Indep. Drivers Ass'n. v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000)).

In order to comply with due process, the Supreme Court has directed a court awarding punitive damages to consider three factors:

> (1) the degree of reprehensibility of the defendant's misconduct;  (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award;  and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 1520-21 (2003). The bankruptcy court in the present case expressly addressed each of these factors in explaining how it arrived at the $2,000,000 punitive damage award, finding that "Adell's conduct was reprehensible and must be deterred and punished," that "within the permissible ratio that the Supreme Court has suggested, punitive damages might be assessed up to about $41,000,000," and that comparable penalties permitted fines of twice the victim's loss. Bankruptcy Op., 291 B.R. at 739 (internal citations omitted). The court concluded that:

> [P]unitive damages of $2,000,000 are necessary and appropriate in this case. Such a punishment is approximately one-half of the compensatory damages of $4,100,000. It is approximately one twentieth of the maximum limit that Supreme Court suggests for due process purposes, here $41,000,000. It is approximately one fourth of the maximum fine for the most analogous federal crime, here $8,200,000. In the Court's judgment, this is the minimum punitive damage amount that will address the dual purposes of adequate deterrence and punishment.

*Id.* at 739.

On appeal, Adell faults the bankruptcy court's analysis for (1) failing to consider mitigating evidence; (2) failing to consider the size of other awards pursuant to section 303(i); (3) concluding that his conduct was reprehensible; (4) if the compensatory damages award is reduced, understating the ratio of punitive damages to compensatory damages; and (5) failing to consider the civil or criminal penalties for comparable misconduct. None of his arguments have merit. Having found no error in the bankruptcy court's finding that the petition was filed in bad faith, or in its credibility judgments, its conclusion that Adell's conduct was reprehensible and that Adell presented no credible mitigating circumstances is amply supported by the record. Having upheld the bankruptcy court's compensatory damage award, it follows that its analysis of the ratio of punitive damages to compensatory damages is accurate. And, finally, Adell's charge that the bankruptcy court failed to consider the civil or criminal penalties for comparable misconduct is simply false. *See id.*

The only issue raised by Adell that merits any further discussion is whether the bankruptcy court erred by not considering the size of other punitive damages awards pursuant to section 303(i).

We think not.  While the size of other punitive damage awards under section 303(i) is arguably relevant, the Supreme Court's three-part framework for analyzing punitive damage awards does not require courts to make that comparison.  Nor are we persuaded that the bankruptcy court here should have made that comparison simply because its award was, according to Adell, the "biggest" ever.  Where, as here, a bankruptcy court follows the applicable law and thoroughly and persuasively explains the basis for its punitive damages award, there is no basis for concluding that the size of the award was an abuse of discretion.

## E.  Fees and Costs

The bankruptcy court awarded JRH attorneys' fees and costs.  *Id.* at 740.  On appeal, Adell argues that the bankruptcy court should not have awarded them because (1) he filed the petition in good faith and (2) the claim was not subject to a bona fide dispute.  Neither argument has merit.  As discussed above, this Court has found no error in the bankruptcy court's bad faith ruling.  Accordingly, Adell's challenge to the award of fees and costs based upon his claimed good faith must fail.  As for Adell's contention that his claim against JRH was not subject to a bona fide dispute, that issue was decided against Adell when the bankruptcy court dismissed the petition, and Adell did not appeal that ruling.

## III.  CONCLUSION

For the reasons stated in the foregoing opinion, the district court's decision affirming the bankruptcy court's award of compensatory and punitive damages, attorneys' fees, and costs is AFFIRMED.

## *APPENDIX*

## CHRONOLOGY (December 2001 - July 2002)

### December 2001

1.      On December 28, 2001, Adell and JRH entered into a Residential Building and Purchase Agreement ("Agreement"), providing that in exchange for $3,030,000, JRH would sell Adell a 1.8 acre parcel of land in Bloomfield Hills, Michigan, and construct a home for Adell there. JA 779-787.

2.      Although JRH's cost in the land was in excess of $1.7 million, the Agreement did not specify how the $3,030,000 would be allocated between the land purchase and the home construction. JA 648.

3.      The Agreement required JRH to commence construction "within a reasonable time after this Agreement is signed and plans are completed and [a] permit is issued." JA 780.

### February 2002

4.      On February 28, 2002, the sale closed. JA 646. According to the "Warranty Deed" and the "Settlement Statement," both of which were signed at the closing, $1,750,000 out of the $3,030,000 was for the land purchase, leaving $1,280,000 for the home construction. JA 717-18, 792.

### March-April 2002

5.      Adell called Shekerjian to complain that the "dewatering" of his site had ceased. JA 653. Shekerjian explained to Adell that JRH had temporarily stopped dewatering until it obtained a permit from the City to continue through the night because otherwise the dewatering would be pointless. JA 653. Within a few days JRH had obtained the necessary permit. JA 653-54. However, at that point, Adell told Shekerjian that he wanted someone else to build his home, specifically his brother-in-law. JA 653, 654.

6.      Around this same time, Adell told Shekerjian about a permitting dispute he had previously had with another town. He told Shekrjian that in retaliation for the "hard time" the town gave him, he built "the ugliest home he could possibly think of just to piss them off." JA 658-661.

### May 2002

7.      Adell's representative and then Adell himself contacted Debra Lee Bjorkly, a former JRH employee (from August 2000 until April 2002). JA 885. Adell had met Bjorkly twice before in the course of his dealings with JRH. JA 882, 883. When Adell's representative told Bjorkly that Adell had just learned about the water on the property, she told him that "everybody knew there was water on the property." JA 885-87. Bjorkly later testified that Butch Friedman, the construction manager working on Adell's house, was frustrated by the amount of water on the property. JA 897-98. Bjorkly also told Adell that JRH was having financial trouble. She testified that she had told Adell that in November/December 2001 things were very tense in the office because there were a lot of trades in the reception room waiting for money, that one employee had asked to have her desk moved because she didn't want to see the trades going back and forth outside her window, that the construction manager for Adell's property was frustrated by trades not showing up because they hadn't been paid, and that her customers before she left had been "upset" because "they felt that their projects were being put on hold or being delayed, that trades were not showing up, products were not being released," JA 893-94, 897-98. Subsequently, Adell called Bjorkly and asked her if

she had a list of vendors or trades who were owed money by JRH. JA 889. She gave him a verbal list over the telephone. JA 889. Eventually, JRH and Bjorkly ended up in litigation; according to Bjorkly's later testimony, JRH sued her for disclosing confidential information. JA 896.

8.      Adell contacted William Seklar, an employee of one of the JRH affiliates from January 1999 until he was terminated on November 30, 2001. JA 959-60. Seklar, whose job had been the high-end marketing and sales of custom homes, JA 949, told Adell that he had been involved in the purchase of Adell's property and had sought a variance to change the grade for Adell's property due to the water levels. JA 958-59. He also told Adell that JRH was having financial troubles. Seklar later testified that he told Adell that he had encountered difficulty performing his job for JRH starting certainly by the year 2000 because JRH was "having difficulties in completing clients' homes, difficulties in paying trades, difficulties in getting trades to respond to us to work on the client residences," and that "[t]here was[sic] liens put on customers clients' homes." JA 949-50.

9.      When Shekerjian learned that Adell or his representatives were contacting JRH's contractors and former employees, he had one of his attorneys, E. Michael Morris, call Adell's attorney, Dennis Dlugokinski, and warn him that they considered such contacts to be "highly improper and actionable." JA 807.

10.      Adell then had Dlugokinski send a letter to Shekerjian. In that letter, dated May 31, 2002, Dlugokinski stated that he represented Adell in connection with his claims arising out of his purchase of property from Shekerjian, that he intended to "pursue civil remedies and/or criminal investigations by and criminal remedies through the the Michigan Attorney General's Office, the Oakland County Prosecutor's Office and/or the Federal Bureau of Investigation and other federal and state agencies and departments having jurisdiction." To "resolve the matter before the institution of a lawsuit," Dlugokinski advised Shekerjian to "mak[e] immediate arrangements to remove any and every mortgage and/or lien against the property," to "cancel[] indebtedness owing or allegedly owing by Mr. Adell," and to "mak[e] restitution and pay[] appropriate damages to Mr. Adell." JA 805. Dlugokinski gave Shekerjian until 5:00 p.m. that day to respond. JA 805.

## June 2002

11.      Shekerjian apparently did not respond to Dlugokinski's letter, but on June 3, 2002, he and Morris met with Dlugokinski and Adell to discuss matters. JA 467-68. At that meeting, for the first time, Adell told Shekerjian that he thought he had paid too much for the property, asserting that the property was worth $1 million instead of $1.75 million. JA 654. In response, Morris told Adell and Dlugokinski to drive out to the Bloomfield Hills area and check out the prices for a one acre lot, suggesting that by doing so they would discover that the price Adell paid for his 1.8 acre lot was "actually reasonable." JA 473-74. Morris also reminded Adell and Dlugokinski that Adell had signed the Settlement Agreement and the Warranty Deed, both of which showed the cost of the land as $1.75 million. JA 473.

12.      During the June 3 meeting, Shekerjian tried to resolve the matter by offering to buy the property back. JA 655. Not only did Adell refuse Shekerjian's offer, JA 655, he also threatened to file an involuntary bankruptcy petition against JRH, asking Shekerjian, "Can the company take the hit to its reputation if an involuntary bankruptcy petition was filed?" JA 469-70. Adell denied this, JA 859, 917, but the bankruptcy court found his denial not credible, 291 B.R. at 733. Morris told Adell that filing such a petition would be improper; he also cautioned Adell and Dlugokinski again that, in his opinion, any contacts Adell or his representatives made with JRH's vendors or suppliers would be improper. JA 470.

13. After the June 3 meeting, Morris sent three letters to Dlugokinski, all dated June 5, 2002. JA 475.

    a. One letter dealt with Adell's threat to file an involuntary bankruptcy petition. Morris reminded Dlugokinski that Adell had already been warned not to contact JRH's contractors, yet since that warning Adell had solicited another JRH contractor to participate in an involuntary bankruptcy petition. JA 807. He also advised Dlugokinski that "your client would be subject to severe sanctions for damages in the event it files a frivolous petition for bankruptcy. The sanctions include costs, attorneys' fees and punitive damages." JA 807. Morris continued: "In our opinion, your client has already gone way too far. Once again, we request that you immediately tell your client to cease and desist all attacks and disparagement against our client; and all attempts to solicit the filing of an involuntary bankruptcy petition." JA 808.

    b. Another letter addressed the issue of the land value. In that letter, Morris urged Dlugokinski to engage in his own research as to the value of the real property purchased by Adell, stating that "we believe that upon inquiry you will determine that there are many lots in Bloomfield Hills that are priced well in excess of $1,000,000.00. Indeed, we have little doubt that you will not only learn this to be true, but also will discover that for a lot as unique as the lot purchased by Mr. Adell, consisting of 1.8 acres in a prime location, that the sales price was fair and reasonable." JA 817. The letter also noted that "the closing statement clearly indicated that the land was being transferred for the price of $1,750,000.00" and that "[a]t all times, Mr. Adell was accompanied by professionals advising him in connection with this transaction. Mr. Adell was given a warranty deed to the property at closing, and is now the owner of that property." JA 817-18. Referring to Adell's representation at their June 3 meeting that he had retained another builder, Morris wrote: "If Mr. Adell elects to retain another builder, he will be in breach of the residential building and purchase agreement." JA 818. He concluded: "As things now stand, Mr. Adell has terminated and, in our opinion, breached the building and purchase agreement. Our client has not been permitted to continue with its work on your client's property. We are, therefore, notifying you that our client intends to seek damages as a result of this breach of agreement." JA 818.

    c. The third letter Morris sent to Dlugokinski on June 5 was "for settlement purposes only" and stated:

> Please contact us to discuss this matter. We stand ready to provide reasonable assurances as to our client's ability and intention to proceed with the construction of your client's home. In the alternative, we should be able to find common ground and resolve the claims of your client, particularly once your client learns the true market value of the lot he purchased.

JA 819.

14. On June 6, 2002, without responding to any of Morris's letters, Dlugokinski, on behalf of Adell, filed suit against JRH and Shekerjian in the Oakland County Circuit Court. The complaint included a number of claims (e.g., fraud and misrepresentation, silent fraud, innocent fraud, conspiracy to defraud and evade the Builder's Trust Fund Act and Construction Lien Act, breach of contract, and Consumer Protection Act violations), all of which essentially rested on two allegations: (1) that Shekerjian and JRH had orally told Adell that the land was worth $1 million and that the home they would construct for him would have a value of $2,000,000, despite the fact that the executed sale documents allocated $1.75 million to the value of the land; and (2) that Shekerjian

and JRH had told Adell that building would begin immediately after the sale closed, even though they knew that would be impossible because of "water problems" on the property, and that the ensuing delay in commencing construction was not "reasonable." JA 721-22, 726-27, 186, 656, 719-46.

15.    On June 14, 2002, Adell contacted Cynthia Weaver, an employee of E.W. Kitchens, a supplier for and creditor of one of JRH's affiliates. JA 499. Adell told Weaver that he had purchased property and was having a home built by JRH, but that he was having problems with JRH. JA 503. For example, he (falsely) told her that Erb Lumber had refused to deliver lumber to his property because JRH owed them money. JA 503, 647. He also told her that "he was a very rich man, that he was a very angry man," and that "he was looking for creditors to sign with him to force [JRH] into bankruptcy." JA 500. Finally, he told Weaver that it would not cost her anything, but that if she wanted to be paid, that was the only way. JA 500. Adell denied making any of these statements, JA 849-51, but the bankruptcy court found that Adell's denials lacked credibility. 291 B.R. at 733. Adell gave Weaver the name of an attorney to call to verify his information. JA 500. Weaver called the attorney, Michelle Didorosi, who confirmed everything Adell had said. JA 502.

16.    Around the same time as he contacted Weaver, Adell also contacted Robert Clark, an employee of Motor City Stone, an underground excavating company and a creditor of JRH (or its affiliates). JA 525-27. In the first call, Adell told Clark that only people who signed on to the involuntary petition would be paid; in the second call he threatened to make certain that people who did not sign on would not be paid. JA 525. Again, Adell denied making any such statements, JA 854, but the bankruptcy court found his denials not credible. 291 B.R. at 733. Clark told Adell that he would have to "pass" on joining the petition on the advice of his accountant who told him it would not be in his "best interest." JA 528-30.

17.    On June 17, 2002, an attorney representing JRH in the state court civil action sent a letter to Dlugokinski, stating:

> It has come to my client's attention that your client, Mr. Adell, and/or Mr. Adell's agents, is calling and otherwise communicating with the contractors and sub-contractors of John Richards Homes and telling them the following:
>
>> (a) that John Richards Homes is in a troubled financial condition and is generally not paying its bills as they become due;
>>
>> (b) that Adell has a legal basis to force John Richards Homes into involuntary Chapter 7 bankruptcy, and will force John Richards Homes into Chapter 7 bankruptcy; and
>>
>> (c) that John Richards Homes had wrongfully diverted funds paid by Adell for the construction of his home.
>
> These statements are false and are obviously designed to have the effect of damaging and/or destroying the longstanding relationship of John Richards Homes with its contractors and subcontractors, by falsely causing these contractors and subcontractors to regard John Richards Homes as not honoring its financial obligations, as being financially insecure, as having no credit and as being insolvent.

JA 801.

18.    On June 18, 2002, JRH and Shekerjian jointly filed in the state court civil suit: (1) an answer denying the substance of Adell's claims; (2) affirmative defenses; and (3) a verified counter-complaint alleging breach of contract, business defamation, business libel, injurious

falsehood, tortious interference with business relationships and extortion. JA 747-777. JRH also asked the court for a temporary restraining order and a preliminary injunction to enjoin Adell "from communicating in any manner about John Richards Homes with any of the contractors, subcontractors and suppliers, financial institutions, architects, clients and other persons and entities with which John Richard Homes does business, pending the determination of this matter." JA 776.

19.     Also on or about June 18, 2002, another of JRH's attorneys, Steven Howell, called Bob Carson, an attorney he believed had been retained by Adell to file an involuntary bankruptcy petition, to "try to explain facts and circumstances from John Richards Homes' perspective" and to tell him that he thought filing an involuntary petition would be "extremely ill-advised and improper" because "there were two sides to the story," "that the story relating to these two parties was one that was the subject of dispute" and "extremely contentious," and that the Adell's claim against JRH was "involved in litigation in Oakland County Circuit Court." JA 487-88. Howell also told Carson that JRH would contest any bankruptcy petition. JA 488.

20.     On June 24, 2002, Adell filed an involuntary bankruptcy petition against JRH. JA 28. The petition alleged that JRH was "generally not paying [its] debts as they become due, unless such debts are the subject of a bona fide dispute." JA 28 (citing 11 U.S.C. § 303(b)). Adell's own claim against JRH, according to the petition, was for fraud and breach of contract in the amount of $800,000. JA 29. The petition was signed by Adell and one of his bankruptcy attorneys, Arnold Schaefer.

21.     Before filing, Adell had been advised by Max Newman, the bankruptcy attorney who oversaw the preparation and execution of the involuntary bankruptcy petition, that it was of critical importance that he have an undisputed claim over $12,000 and that if JRH did dispute his claim, "there would be a big problem." Relying solely on Adell's (and his attorneys') assurances, Newman believed JRH would admit a claim in the range of $130,000. JA 940. He used the $800,000 figure to avoid any risk that the court would think Adell's entire claim was limited to a smaller amount. JA 940. Adell had not informed Newman, however, about Morris's June 5 letters to Dlugokinski clearly stating that JRH would dispute any debt to Adell or about JRH's answer to Adell's state court civil complaint denying any debt to Adell. JA 943-45. As for JRH's solvency, Newman relied in part on Adell's representation that Shekerjian had offered to return his money but with credit terms because he didn't actually have the money available. He also learned that State of Michigan records showed approximately 20 or 21 entities with names similar to JRH, suggesting to him that JRH was a single purpose entity, that he had not found a builder's license in the name of JRH, and that Adell's check to JRH had been deposited in a different entity. JA 937-39.

22.     Shortly before filing, Adell contacted Michael Layne, a partner in the public relations firm, Marx Layne. JA 531-32. He retained the firm "to make the news media aware of the bankruptcy filing against [JRH]." JA 535, 561-62. He told Layne that he thought "he was being screwed by the bank and his developer." JA 551. His claim that he filed because "the trades weren't getting paid and his house wasn't getting built," JA 551, 561-562, was not credited by the bankruptcy court. Ultimately Marx Layne, at the "express bidding" of Adell, contacted three newspapers to inform them about Adell's filing an involuntary petition against JRH: the Detroit News, the Detroit Free Press and Crain's Detroit Business . JA 535-36, 542, 834-35.

23.     On June 25, 2002, the day after the involuntary petition was filed, a Marx Layne representative sent separate e-mail messages to reporters for the Detroit News and the Detroit Free Press announcing that the petition had been filed and asserting that recent "payoffs" by JRH to its creditors "won't do any good." JA 538, 834, 836. Each message listed nine allegedly dissatisfied JRH customers, JA 834-37, the names given to Adell by Bjorkly, JA 859-60, JA 890, and passed on to Marx Layne by Adell's secretary. None had ever been contacted directly by Adell or anyone

from Marx Layne. JA 543-44, JA 860. At least two of the nine, Jean McIntyre[1] and Larry Gainer,[2] in fact had no problems with JRH. JA 984-990. These e-mails also announced that a hearing in the state court civil suit set for the following week was "sure to be worthy of coverage with plots and subplots and high profile business people coming to the surface" and falsely stated that the recipient was the only reporter in the area with this information. JA 539-42, 834, 836. Finally, each message stated, "We would appreciate you keeping our name out of any conversations regarding this high-profile story." JA 834, 836. On July 1, 2002, Marx Layne faxed a copy of the involuntary bankruptcy petition to a reporter with Crain's Detroit Business, along with same list of purportedly dissatisfied JRH customers. JA 820-824. Ultimately, Crain's ran a single sentence announcing the filing. JA 537.

24.      On June 26, 2002, one of JRH's bankruptcy attorneys, Steven Howell, called Schaefer and told him that he thought the petition was improper because, *inter alia*, Adell's claim was the subject of litigation. JA 490. Schaefer indicated that he thought some portion of the claim was undisputed, which Howell denied. JA 491.

### July 2002

25.      Agreeing with JRH that Adell's claim was subject to a bona fide dispute, the bankruptcy court granted JRH's motion to dismiss the petition.

---

[1]Jean McIntyre testified that her home was completed in April 2002, that she had never spoken with anyone from Marx Layne nor seen the e-mail with her name in it, and that she was very happy with her home and had no complaints against JRH. JA 986.

[2]Larry Gainer testified that JRH began constructing his home in June 2002, that work was still being done, but he had moved in in December 2002, that he had never seen the Marx Layne e-mail or talked to anyone from Marx Layne, and that he had no claims against JRH and was happy with their work. JA 988-89.